I promise this case on the morning call of the people of the State of Illinois v. David M. Hall, Case No. 210-0260. And on behalf of the, excuse me, on behalf of the applicant, Ms. Rita Stotts, on behalf of the athlete, Ms. Sarah McIntosh. Thank you. Ms. Stotts? May it please the court and counsel, my name is Rita Stotts, I'm with the Office of the Illinois Attorney General, and I represent the people of the State of Illinois. The trial court made two erroneous pre-trial rulings in this DUI case. First, it excluded the results of a blood alcohol test, based solely on the fact that the test was not performed in compliance with the state police regulations, even though there was no evidence that that non-compliance made the result unreliable. And the court also dismissed a later filed DUI count under the Speedy Trial Act, even though that new count wasn't a new and additional charge. Both of those rulings should be reversed, and I'd like to start with the blood alcohol ruling. That ruling is flawed in two different ways. Can you raise a third issue? I'm sorry? Didn't you raise a third issue, or am I misunderstanding? I thought the third issue was, not only did the trial court err in excluding the blood alcohol test relative to the DUI, but as to the other charges as well, the companion charges. Right, and that was going to be my first point. The first aspect of the alcohol ruling that was flawed is that the ruling should never have extended to those non-DUI counts. That's clear from the statute. It's clear from the Supreme Court's decisions in Emmerich and Murphy. And, in fact, in Emmerich, the Supreme Court even said that that rule holds true even where the non-DUI counts are joined. What relevance would his intoxication have for resisting for improper turn or improper lane usage? What relevance would the blood alcohol result, and I understand possibly to impeach, but you can do that with the testimony from the officers and from the doctor. So what relevance does it, per se, or the blood alcohol over the limit have to those other prosecutions? Well, I would first say that relevance is something to be determined by the trial court in the first instance. And it's going to depend on exactly what evidence comes out at trial. So, given that qualification, one possibility is that it's relevant to the resisting charge because it shows a motive to resist. The defendant had a .107 ethanol level. He knew that he was DUI, and that gave him a motive to resist arrest in the ways that he did. Refused to get out of the car to perform field sobriety. Tried to roll up the window on the arresting officer. Turned the ignition key, perhaps, in an attempt to… Is this other crimes evidence that has to be weighed for his prejudice? Again, I think that's a question for the trial court in the first instance. But it wouldn't be other crimes evidence. The theory wouldn't be that we'd offer it to prove that if he did this other crime that he also did the resisting, but it would help to show motive. So, you know… The court, in excluding the evidence, was considering the fact that you still have the 02 count of DUI, and there's going to be prejudice to the defendant as a result of introducing the per se count for these other offenses. Isn't that really what it boils down to, is weighing the potential relevance against the prejudice? Again, that's a potential argument that the defendant might raise at trial. He could argue under Rule 403 that the… I suppose that the potential for unfair prejudice outweighs the probative value of the ethanol result. But that's not the subject of this appeal. The only argument defendant raised in the trial court was this evidence should come out because the regulations were not complied with. That's the only thing the trial court ruled on, and that's the only thing we're disputing here. Can you discuss the regulations and your theory that there was substantial compliance? Sure. There are two regulations at issue here, and the test was, in fact, noncompliant with both of those. But the fact is that the result comes in anyway under the substantial compliance inquiry, and that asks two questions. First, was the regulation violated? And second, if it was, is there any evidence that that noncompliance actually made the test unreliable? If there is any evidence to that effect, then the test is automatically excluded under this court's decision in Ebert. The court made this clear in Ebert. It said if there is a real scientific dispute about reliability, the trial court shouldn't try to resolve that dispute. That scientific question is beyond the court's expertise, and what the court does is just give the defendant the benefit of the doubt and exclude the evidence. On the other hand, in a case like this, where there is no evidence that the compliance led to an unreliable result, the test comes in anyway. And that's clear for Ebert as well, where this court said applying the regulations in this purely rote manner by excluding the evidence in every case where they're not followed, even where there's no reason to think reliability is affected, that would frustrate the truth-seeking process by excluding the reliable evidence. So in here, in this case, the substantial compliance test was met with respect to both regulations. The first one was that... prior to the breathalyzer test. However, I believe Ebert determined that because the defendant indicated on his own that nothing transpired untoward towards the reliability of the test, meaning no belching, regurgitation, vomiting, etc., that the need for the unscientific overwatch or supervising of the police officer was deemed not a substantial amount of compliance. I don't know how you can differentiate between rules and regulations relating to blood tests and blood tests that aren't in compliance with the rules and regulations, because it seems to me that the rules and regulations relate to blood tests because blood tests are based upon scientific analyses. And if you're going to use scientific analyses of a blood test to establish that there has been compliance under Ebert, it would seem that you're comparing apples to oranges. The apple happens to be the non-scientific observation by a police officer versus the orange, the scientific analysis of blood. I disagree slightly with that analysis. I think this Court did acknowledge in Ebert that the regulation it issued there was designed to ensure reliability, the idea being that if the defendant has something in his mouth, the result could be off. So it's not distinguishable on the basis that Ebert wasn't a regulation geared toward reliability. It was, and this Court acknowledged that. But what the Ebert holding shows is that even if the regulation is geared toward reliability, that's not enough to mean that noncompliance necessarily means the result must come out. It's still up to the defendant to meet this minimal burden under Ebert of introducing some evidence to show that the noncompliance affected their result. And that's what the defendant couldn't do here, and that's why the substantial compliance test was satisfied. The best he had was this pharmacist, James O'Donnell, and the only theory O'Donnell had as to how the lack of a preservative could affect the result was that there could be bacteria in the sample, and that could result in the production of alcohol in the sample, too. Alcohol is an entire class of organic compounds. There's many different types of alcohol. When O'Donnell did get specific, he said it produced methyl alcohol. Or isopropyl or propanol, yes, which raises a point I was going to ask out of curiosity. This was a gas chromatography, is that correct? Headspace gas chromatography, yes. And it claimed that the ethanol reading was such and such. Does that gas chromatography only register the molecule ethanol, or does it register the radical alcohol? If I understand your question correctly, you're asking, did the test also give a reading that would encompass all the categories of alcohol? My understanding of breathalyzers is that the breathalyzer doesn't measure ethanol. It measures an alcohol radical. And things like albuterol, which is a medicine that people use, will register a reading on the breathalyzer machine. And it's because it registers the alcohol radical that is on the carbon chain. And I believe an alcohol radical is an oxygen bond and an OH bond onto a C or a carbon atom. If it's methanol, there's only one C. If it's ethanol, there are two Cs. Propanol is three Cs. Albuterol may be 12 or 15 or 25 Cs, but they're still the alcohol radical, which is the last tail or whatever, the designation with the O and the OH bond. So when it said an ethanol reading, gas chromatography, was it actually reading ethanol or was it just reading an alcohol radical, which people presume to be ethanol because there's no evidence that he took albuterol or methanol or propanol, because those are poisonous? It was actually reading ethanol. And I should point out, this wasn't a breathalyzer case. This was a blood draw case tested by headspace gas chromatography. The toxicologist, Jennifer Polterak, was very clear in her testimony, and it was absolutely undisputed, that the method she used separates out the different organic compounds, isopropyl alcohol, ethyl alcohol, methyl alcohol, distinguishes them. She only measured ethanol. That .107 reading, and that's the only reading the state ever sought to introduce in this case, was pure ethanol. So O'Donnell's testimony about this methanol contamination was simply irrelevant. It wasn't enough to draw the result into dispute at all. Yes, this is really a hybrid between 11501.2 and 11501.4. The police abandoned their attempts to get a DUI kit under O2, correct? It's not clear, but as far as the record reflects, that wasn't done. But the defendant wasn't told, at least, but not given warnings, but told that there be a blood draw. And then that's not done. The state later learns that, yes, indeed, blood was drawn at the hospital, which is perfectly appropriate to call and answer that question, but no testing was done. So O4, which requires a test to be done by the hospital lab, the blood is taken, which would have been admissible had it been tested at the hospital, but because it wasn't, it's tested at the state police lab, which complies with O2. So isn't it really a blend of O2 and O4? It's not simply an O2 and an O4? I think that's absolutely correct. The problem is that the Illinois Supreme Court has said compliance with the regulations are required for admissibility of blood or breath tests in a DUI prosecution, correct? Correct. The court has said that the regulations are mandatory, but it's a different question of whether a regulation is mandatory doesn't necessarily mean that noncompliance gets the defendant a remedy. The Supreme Court's made that very clear in other cases in similar contexts, dealing with violations of Supreme Court rules, for example, like the Glasper case. The court's made clear the rule is mandatory and it was violated, but that doesn't mean the defendant gets to benefit from it. You're asking us to excuse the requirement to have a police officer present for the draw of blood, which is going to be tested at the state police crime lab, and you're asking us to excuse the failure to allow, in O4, to have the blood tested by the hospital's lab for purposes of diagnosis or treatment, as well as the failure to have a preservative in the sample, which makes sense when you're talking about hospital blood, because it's traditionally done immediately because the patient is still in the emergency room and the doctor needs the blood results so we can determine a course of treatment and make sure the medications that he's giving is not going to have a reaction because of the alcohol intoxication. So aren't these requirements pretty, they're there for those reasons? And you're asking us to forgive both in O2 and O4 violation? Well, I'd agree to some degree. I would add, as to the regulation requiring a law enforcement officer to observe the draw, the defendant hasn't made any argument attempting to defend the ruling on that basis, and there's clearly substantial compliance. The defendant admitted this was his blood. The testimony is clear. It was labeled at his bedside. So the authenticity of the sample, that regulation I think we can set to one side. As to the preservative, we're not asking the court to ignore the requirements. These requirements under this EBERT substantial compliance analysis still function to protect the defendant from an unreliable test. The defendant has a minimal burden. All he has to do is put forward some evidence showing that reliability is affected. And if he can do that, he wins. The evidence is out, even if he's wrong, even if it's actually disputed. And I would add to the point about the comparison between 5014, it's true that the legislature has essentially exempted 5014 tests from the preservative requirement because they're done in the hospital. But I would add, you know, this sample was stored in the hospital until the day it was tested. And the hospital had a different method of preserving it. It didn't add a preservative, but it kept it refrigerated. And that worked the same way to slow the growth of bacteria. So it is somewhat between the two regulations, but the logical question to ask is, is reliability affected? And here a defendant's been unable to show that. If we're going to overrule the trial court, should we have a prior hearing to determine whether or not what the trial court did was against the manifest weight of the evidence and in violation of scientific principles? If I could just briefly respond, I see my time is up. Defendant never raised a Frye objection in the trial court. If he wants to do that at some point, he probably still has an opportunity to. It's not raised in this appeal, but I expect we could easily meet it. If that test has already been accepted and enrolled in scientific community and the court has already conducted a Frye test, he's not entitled to another one, correct? Oh, that's correct, right. It's the only world. Any other questions? Thank you. You have an opportunity to make rebuttal. Ms. Toney. Thank you. May it please the Court, Mr. Statz, my name is Sarah Toney. I represent the appellee, David Hall, in this matter. There are two issues in this appeal. First, whether the trial court properly excluded the blood. And second, whether the trial court properly dismissed the 501A1 or BAC over a .08 count for a speedy trial violation. I would like to first touch upon whether the blood was correctly excluded, and I believe that it was. As Your Honor, Justice Burkett has noted, there are two ways that blood is admissible at trial in a DUI prosecution. The first being if a defendant is injured, taken to a hospital for treatment, and in the course of that treatment, blood is taken and tested. That is what is contemplated by 501.4. The second scenario is where we have an uninjured defendant, and the blood test is taken at the request of the arresting officer. That standard contemplates that a DUI kit would be used, or a gray top vacuum tube with a preservative in it, that a non-alcohol swab would be used, and that that test would then be sent to a crime lab. As Justice Burkett noted, we have a hybrid of both 501.2 and 501.4 here. Because the defendant was taken to the hospital, the blood was taken. It was tested, but not for alcohol. The test on the blood was not at the request of the officer. In fact, the officer left during the course of treatment, and the blood was not taken in a DUI kit and was not put into a vial that had a preservative. Nineteen days later, a police officer arrives at the hospital, picks up the blood, takes it to a crime lab. The state conceded on the record multiple times before the trial court that 501.4 does not apply in this case. Therefore, we're left with the issue of whether 501.2, under those standards of admissibility, whether the blood can come in under that section. Clearly, it cannot, because 501.2 requires that in order to have the admissibility of the blood, the standards promulgated by the Department of State Police must be followed. Those standards are promulgated in 1286.320 of the Illinois Administrative Code. That code requires, in subsection A, the presence of the police officer at the blood draw. We know we don't have that here. What about the state's argument that you waived that and didn't raise it below? The appellate court is free to consider anything that's in the record. It is in the record that the officer was not present for the blood draw. In addition, subsection D says that if— How is it contained in the record? Is it testimony or argument or what? There is no testimony in the record to support that the officer was present. I believe that there are admissions on the record that he had left. Well, no testimony. The absence of evidence is evidence of absence or is not, but the point is it's just because there's nothing about whether it was or it wasn't doesn't prove the negative. I believe there is testimony in the record that the officer had left and that he was not present for the blood draw. Dr. Keene testified that he had the blood drawn in the course of treatment and not at the request of the officer. One of the points, obviously, is that this was not blood that was drawn at the request of the officer. So is your position that reliance on 11-501-2 is really inappropriate? It wasn't drawn at the request of the officer? That's one of many reasons that the blood cannot come in under 501.2. That's just one problem. Another problem would be that under D of the standards, it says to use a DUI kit if possible. In this case, we know a DUI kit was not used, and there was no evidence presented by the state that it was not possible to use a DUI kit. The standard in subsection D goes on to say that if a DUI kit is not available, the blood should be put into a gray-topped vacutainer tube that, according to industry standards, contains a preservative. Even the attorney general admits on the record there is no evidence to support the fact that the vials used in this case contained a preservative. In fact, there was only contrary evidence offered repeatedly by the testimony of the hospital staff that the vials did not contain a preservative as they testified about what each of the colored toppers mean. And in their testimony, they established that there probably was no preservative in those vials. What about the state's argument that the regulations are there, they're there to ensure that blood can be identified as coming from the suspect, that's been satisfied here, and that the results, the purpose of the preservative is so that by the time testing is done, you're still going to get an accurate result, but that was demonstrated by proof that the blood remained refrigerated at the hospital all the way up until the day it was delivered to the state police and then ultimately tested. So they've satisfied that standard by showing that the results were not contaminated. I mean, the state's argument is compelling that they have otherwise satisfied the purpose or the goals of the code. They just didn't have strict compliance, but the purposes behind these provisions have been satisfied. Would you concede that? Absolutely not. Why is that? First of all, there is zero testimony. First of all, I want to point out is the burden of the state to establish the admissibility of the evidence they intend to produce. They have not done that. They produced zero evidence that refrigeration of the sample satisfies the requirement or somehow makes it okay that there was no preservative in the blood. That testimony was never presented. That may be a scientific fact, but it's not on the record. Is that what you're saying? Correct. The state presented no evidence that refrigeration somehow made the lack of preservative in the sample, made that sample still reliable. That argument was advanced for the first time this morning. Second of all, the fact that the blood vials were labeled with the defendant's name is only one of the seven standards listed, and that only goes to identification. It does not go to whether or not the blood was properly preserved. And the evidence in this case, the only evidence in this case that was presented by Dr. O'Donnell, is that the blood was not properly preserved. And he says over and over and over again how the test has to be rejected, that it is unscientific, that it- He's a pharmacist, correct? He's not a toxicologist. I don't believe he's a toxicologist, but I- I think the record shows that he was a pharmacist, and that his testimony related to the potential contaminate or potential misreading because of methanol, but doesn't the headspace gas chromatography separate methanol from ethanol? Dr. O'Donnell was qualified as an expert to testify for what he testified to. The state, on the record, never rebutted Dr. O'Donnell's testimony. They could have presented their own expert in rebuttal to rebut what Dr. O'Donnell says. On March 2nd, the trial court says, is there any other evidence to be presented? And the attorney general says, not on behalf of the people. They rest. They choose not to rebut his testimony. So what we have is an expert who's been qualified, who testified over and over about how the sample was tainted, how it was not the same sample that was originally taken from the defendant, how it's been contaminated and adulterated, and how it cannot be relied upon in this case. So I don't believe that the state has satisfied the condition that they have proven the reliability of their standard, of the blood test. Further, the standard goes on to say that, in subsection F of 1286.320, that the samples have to be delivered as soon as practicable to a lab certified by the department. Clearly, the blood was not delivered as soon as practicable. The state waited 19 days to pick up that sample and take it to the lab. Nineteen days from learning that the sample was there, or 19 days from the point of, from the day of the arrest? The state knew that the blood had been drawn. The officer knew that the blood had been drawn. I believe there's evidence in the record that the state... You don't say when he knew. Was it 18 days, 17, 16, what, 19? The record shows that there was a phone call by the state's attorney, as well as a subpoena issued within a day or two of Mr. Hall leaving the hospital. So if it wasn't 18 days or 19 days, it was 17 or 16. Regardless, more than two weeks had passed before they went to the hospital, picked up the blood, took it to a lab. In the meantime, if sitting in the hospital lab with no preservative, and according to Dr. O'Donnell's testimony, during this time, because the blood is not preserved, it is, the sample is becoming invalid. And if we think about the reason that 501.4 does not have the requirements of following the standards that 501.2 has, common sense would say it's a hospital lab. They're testing blood on a regular basis. They are certified, and they're employing people that are certified. They have their own procedures in place, and they're testing blood in the course of treatment to save people's lives. The blood that's taken in the hospital does not sit around for 19 days, because when you're testing blood in the course of treatment, there's an immediate need to test that blood. So that is why the vials in the hospital do not contain a preservative, because it's not contemplated that that blood would sit around for 19 days without being tested. Versus 501.2, when blood is being taken at the request of the officer, an officer is not trained. He's not a phlebotomist. He's not a toxicologist. Can you address this, the speedy trial argument? Absolutely. The original charge against Mr. Hall was just a driving under the influence charge, the A2 charge. Approximately 520 days after he was charged with driving under the influence, the state added the count of A1, or driving with a BAC over a .08. The Williams court has said that continuances on the original charges that are before a defendant cannot be attributable to a defendant with respect to new and additional charges, because those new and additional charges were not before the court when the continuances were obtained. Did Williams involve somebody who had filed, a defendant who had filed a speedy trial demand? I don't recall if Williams had filed a speedy trial. Isn't that a threshold requirement? If you're going to rely on a speedy trial argument, you must file a speedy trial demand? No. And I think that Williams addresses that. Because the Williams court says we cannot presume that a defendant would have agreed to a continuance had he faced both charges at the same time. We cannot say because a defendant did not file a speedy trial demand on one charge that he necessarily would not have done so on a second charge that he's unaware of. Well, it is true in this case, is it not, that your client did not file a speedy trial demand? That is true. And the argument that seems to be contained in the briefs is that because you didn't know what might have been filed in the future, you really shouldn't be harmed by failing to file a speedy trial demand. I think there's a constitutional speedy right to a speedy trial, and that constitutional right is not implicated by the facts of this case. And then there's a statutory right to a speedy trial. And to trigger a statutory right, there must be a notice filed. And I don't believe the record, I think it's agreed that he did not file a notice. So I think there's a good argument that the statutory right to a speedy trial did not apply. And the due process constitutional right is not applicable to the facts either. I will concede that a speedy trial demand was never filed. But according to Williams, you cannot attribute the lack of filing a speedy trial demand, or in Williams' terms, an acquiescence to continuances. You cannot attribute that to a new and additional charge that's added if compulsive rejoinder is at issue. In this case, it is very clear that the A-1 charge is a new and additional charge to the A-2 charge. As the Vanschack Court says, even though there's only one crime for DUI, there are different elements that are required for proof for a driving over the limit of a .08 versus driving just under the influence of alcohol. If there's a finding of guilty on both, how many judgments are there? Only one. Because there is only one type of DUI. So there are alternative theories for the prosecution. One is just like a felony murder versus an intentional or knowing murder. There are different theories for the same act. Correct? Correct. And they require different elements of proof to be proven. But that equals that the A-1 is a new and additional charge to the A-2. In addition, because of that, the two charges are subject to compulsory rejoinder. The conduct of driving under the influence with a BAC over a .08 and driving while under the influence arises out of the same conduct and out of the same act, and it was known to the prosecution at the time of the charging. So because of these reasons, the Williams decision should apply in this case because it is a new and additional charge, compulsory rejoinder applied, and you cannot allow the state to prosecute a defendant for 520 days. Meanwhile, in the background, preparing to charge him with an additional charge that substantially changes the caliber of a case. Defending against an A-1 is substantially different than defending against an A-2. When you're defending against an A-2, there's a potential that the state may only call one witness, and that's the arresting officer, versus when A-1 is involved. Justice Bowman indicated there are two bases that you could seek relief, and I just want to clarify in my own mind, are you seeking relief on one or both of them, and if it's only one, which one? Well, according to Williams, the statutory speedy trial rate would have been implicated in this case, for sure, because of the fact that... Didn't Williams involve a speedy trial demand, though? There was a speedy trial demand in Williams, wasn't there? I believe that there was. But even still, applying Williams to this case, you cannot attribute delays in one charge to delays in a charge that has not yet occurred. The defendant could not have demanded trial on a charge that he did not know about. And for those reasons, the speedy trial provision should not apply. Thank you. Thank you. Any other questions? Thank you. Ms. Stotts? Do you remember Williams? I do, and Williams was different because that was a case where the speedy trial clock had already started running. I can't remember if it ran automatically because the defendant was in custody or if it had run because a demand was filed. But either way, the question was, was the clock told by the defendant agreeing to a continuance? That's a step ahead of where we are here. In this case, as some of the questions indicated, there is no constitutional speedy trial claim. It's just a statutory claim, and the statute is clear. If you don't file a demand, the clock never starts running in the first place. As to the point about the regulation that requires observing the blood draw, I just want to clarify that our argument is that, not that that argument was waived in the trial court, but that the defendant forfeited it for purposes of this appeal. It was not addressed in defendant's brief, and the Illinois Supreme Court has prohibited the appellate courts from reaching out to address unaddressed arguments. Was it a waiver or a procedural default? Because had they raised it, then you would have been given the opportunity to respond. Right, we did respond in the trial court. Our argument is that it was forfeited for purposes of the appeal because the defendant did not argue that as an appropriate basis for affirming the trial court's ruling. You said waiver, I thought. I didn't hear the word forfeited. I misspoke. It was forfeited because it wasn't raised in the brief. As to the refrigeration, I would just add, that's a point that's appropriate for judicial notice, and I'd ask the court to take judicial notice of the fact. It's common knowledge, refrigeration slows bacterial growth. That's why we refrigerate our food. Defendant also has argued that it was a state's burden to prove that the evidence was admissible. Does it slow viral growth as well? I don't know the answer to that, but all that O'Donnell testified here was about bacteria. It's not exactly true that it's the state's burden to prove admissibility. Our burden is to rebut the arguments that the defendant has raised. And here, under the Ebert test, we didn't need to introduce any evidence because the defendant didn't do his job of calling the evidence into question in the first place. O'Donnell's testimony just didn't cut it because it was irrelevant. What about their argument that there was no testimony disputing O'Donnell's testimony? That's true, but we didn't need to offer it. O'Donnell's testimony just didn't draw this evidence into question. All he said was, this produces methanol. Well, we can assume that's true for purposes of this appeal, but it just doesn't make a difference. We didn't measure methanol, and that's undisputed. As to the defendant's point about 19 days for the blood draw, that's not giving this court the full story. The defendant was arrested on April 26th. We filed a motion to preserve the blood results and to have them released to the state police for testing six days later. The motion wasn't ruled on right away, but that wasn't the state's fault. That was a direct result of the fact that the defendant was a sitting judge. All the judges in Lake County recused themselves. We had to wait for the Supreme Court to appoint a new out-of-circuit judge to hear the motion, and he didn't rule on that motion until May 14th, the same day. Sorry, the evidence was tested the very next day. So your argument is you did do it as soon as practicable. We did, very much so. And the delay in this case was nothing the state could really do anything about. Finally, I would add the approach we're asking this court to take under the Ebert Substantial Compliance Rule is not novel. It's perfectly in line with other substantial compliance cases, like the Bishop case from the 1st District in 2004 and the Bergman case, the 5th District in 1993. Both of those were noncompliant tests. Bishop was a noncompliant urine sample. It wasn't taken on the first emptying of the blood, whereas the regulation required. Bergman was a noncompliant breathalyzer. The defendant ate breath mints during the 20-minute period before the test. That was also a violation of the regulation. But those courts also admitted the evidence because there was no evidence showing those types of noncompliance made the result unreliable. So Ebert is right in line with other cases. It's not an outlier. And as I mentioned, it's in line with the Supreme Court cases in other contexts, interpreting Supreme Court rules and saying, true, this rule is mandatory and it wasn't followed, but that doesn't necessarily mean that there's an exclusionary remedy. Was it a breath mint or a candy mint? It was certs, breath mints. That's both, I believe. It sounds like both. Finally, I would point out the rule we're arguing for, could I briefly conclude? Yes. It's not our rule that's novel. It's defendant's rule that's novel. He's asking this court to assume that any type of noncompliance automatically affects reliability, even when he can't show a shred of evidence. That is an illogical result. So for all these reasons and the reasons in our briefs, we'd ask the court to reverse both the alcohol ruling and the speedy trial ruling. Thank you.